DOCKETED

OCT 2 7 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

———————————————— X

WILLIAM MORRIS, Individually and on Behalf of all Others Similarly Situated,

        Plaintiff,

    vs.

AMERICAN BIOSCIENCE, INC., AMERICAN PHARMACEUTICAL PARTNERS, INC., PATRICK SOON-SHIONG, DEREK J. BROWN, JEFFREY M. YORDON, AND NICOLE S. WILLIAMS,

        Defendants.

———————————————— X

JUDGE RONALD GUZMAN
MAGISTRATE JUDGE ASHMAN

No.

# 03C 7525

*JURY TRIAL DEMANDED*

FILED-ED4
03 OCT 24 AM 11: 35
CLERK
U.S. DISTRICT COURT

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by American Pharmaceutical Partners, Inc. ("APP" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of all persons who purchased or otherwise acquired the securities of APP between February 19, 2002 to September 24, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the

"ExchangeAct"). This action alleges that defendants made materially false and misleading statements with respect to the drug Abraxane, a reformulated version of Taxol under development for the treatment of breast cancer. Throughout the Class Period, defendants hyped Abraxane as a safer and more effective alternative to Taxol, the world's best-selling chemotherapy drug for cancer. Defendants claimed that clinical studies had indicated that: (1) Abraxane could be administered without Cremophor, a toxic substance with severe side-effects that limited the tolerable dose and effectiveness of Taxol; (2) unlike Taxol, Abraxane could be administered without the need for potentially harmful steroid pre-medication and other drugs that reduce the loss of white blood cells; (3) because Abraxane was not formulated with a toxic substance it could be delivered in much higher doses than Taxol and was therefore more effective than Taxol with respect to reduction in tumor size; and (4) because it can be injected intravenously directly to the location of the tumor, Abraxane therapy is only one-half hour, compared to 3 hours for Taxol. The Company stated, repeatedly, that studies indicated that "ABI-007 [Abraxane] is apparently *well tolerated*" at high doses [. . .] ***without the need for steroid premedication and G-CSF support.*** During the Class Period, a consultant hired by APP gave Abraxane an 80% chance of success and pegged the value of APP's license to sell and market the drug at $1 billion. As noted by *Forbes* in an article published on October 7, 2003, based substantially on defendants' claims for Abraxane, "frenzied investors have bid the company's market value up 250% in the past year, to $2.4 billion, or ten times the revenue APP generates from its main business of selling generic injectable drugs."

2.      The truth began to emerge on September 24, 2003. On that date, defendants issued an ostensibly positive news release to announce the preliminary results of Phase III testing of Abraxane. However, commentators noted that the news release did not include the data

underlying the trial results, and that the trial lacked a common safeguard known as double blinding designed to prevent research bias, since doctors and patients both knew whether Abraxane or Taxol was in use. Moreover, in the release APP *narrowed* some of its claims for Abraxane, stating not that Abraxane was well tolerated *without the need for steroid premedication* and G-CSF support [to reduce loss of white blood cells] but rather, noted the absence of "severe hypersensitivity reactions despite *no routine pre-medication* in patients receiving Abraxane" and stated that the procedure was to administer Abraxane "without *routine* steroid pretreatment or growth factor support." The lack of backup data, and the distinction between "*no* steroid pretreatment" and "*no routine* steroid pretreatment" was not lost on investors; as the market digested the release and its implications, APP's share price fell 21% from a Class Period high of $44.14 on September 24, 2003 to a closing price of $29.59 on September 26, 2003. Two trading days before the announcement --- but after APP had seen the Phase III trial results --- defendant Patrick Soon-Shiong ("Soon-Shiong") disposed of 300,000 shares of his personally held APP stock while the stock was trading at between $38.68 and $35.47.

3. Commenting on APP in an article published on October 6, 2003, *Barron's* illustrated that Soon-Shiong, APP's controlling shareholder and Chief Executive Officer, is no stranger to these type of shenanigans, and that he already had gained financially from market acceptance of Abraxane as a nascent alternative to Taxol. In this regard, the article stated:

> In the early 1990s, Soon-Shiong earned notoriety as a physician who tried to cure diabetes through cell transplants. The treatment failed, as did the business venture based on the treatment -- leaving the doctor embroiled in lawsuits with embittered business partners, including his brother.
>
> Soon-Shiong settled those lawsuits for $32 million, which he could well afford after he became a billionaire from the 2001 public

offering of APP, an injectable drug business that has the marketing rights to Abraxane. Over two-thirds of APP shares are owned by Soon-Shiong's private firm, American Bioscience --- which got a quick $60 million for licensing Abraxane to its subsidiary APP. It's registered to sell 3 million APP shares.

4.      APP stated in its public filings that the level of market share, revenue and gross profit derived from its products is related to timing of regulatory approval and launch and its relation to competing approvals and launches. During the Class Period, APP competitor Cell Therapeutics, Inc., NeoPharm, Inc. and Sonus Pharmaceuticals, Inc. all were racing to develop their reformulations of Taxol. Consequently, defendants at all relevant times were under substantial pressure to speedily win approval of Abraxane as a new drug and bring Abraxane to market.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

8.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

*Plaintiff*

9.     William Morris as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of APP at artificially inflated prices during the Class Period and has been damaged thereby.

*Defendants*

10.     American Bioscience, Inc. ("American Bioscience") is a California corporation with its principal place of business located in Santa Monica, California. At all relevant times, American Bioscience owned 31,989,440, or 68.2%, of APP's outstanding shares. American Bioscience is 80% owned by defendant Soon-Shiong, who serves as American Bioscience's Chairman and Chief Executive Officer.

11.     APP, a majority owned subsidiary of American Bioscience, was, at all relevant times, a Delaware corporation with its principal place of business located at 1101 Perimeter Drive, Suite 300, Schaumburg, Illinois 60173. In its public filings, the Company describes itself as a specialty pharmaceutical company, with a primary focus on oncology, anti-infective and critical care markets that develops, manufactures and markets injectable pharmaceutical products.

12.     Soon-Shiong served as APP's Chairman, President and Chief Executive Officer at all relevant times. Soon-Shiong also served, at all relevant times, as American Bioscience's President, Chief Financial Officer and as a director of American Bioscience. Soon-Shiong beneficially owns more than 80% of the outstanding capital stock of American Bioscience.

13.     Derek J. Brown ("Brown") served as a director of APP and, until August 2002, as APP's Chief Financial Officer. He then served as APP's Co-Chief Operating Officer through the

end of the Class Period. Brown also served as a director of American Bioscience at all relevant times.

14. Jeffrey M. Yordon ("Yordon") served as Co-Chief Operating Officer and as a director of APP at all relevant times

15. Nicole S. Williams ("Williams") served since August 2002 through the end of the Class Period as APP's Chief Financial Officer.

16. Soon-Shiong, Brown, Yordon, and Williams are hereinafter referred to, collectively, as the "Individual Defendants".

17. During the Class Period, the Individual Defendants, as the four top senior executive officers of APP, and three of them directors of APP, were privy to confidential and proprietary information concerning APP, its operations, finances, financial condition, present and future business prospects. Soon-Shiong and Brown also were privy to such information by virtue of their positions as directors and, in the case of Soon Shiong, majority owner, President and Chief Operating Officer of APP's controlling shareholder, American Bioscience. The Individual Defendants also had access to material adverse non-public information concerning APP, as discussed in detail below. Because of their positions with APP, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     Each Individual Defendant is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as the two top senior executive offices and one of them a director were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of APP's business.

19.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     As officers and controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ national market and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to APP's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of APP's common stock would be based upon truthful and accurate information.

The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of APP common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding APP's business, operations and management and the intrinsic value of APP common stock; (ii) enabled Soon-Shiong to dispose of 300,000 shares of APP common stock for his personal gain at artificially inflated prices while in possession of materially adverse nonpublic information; and (iii) caused plaintiff and members of the Class to purchase APP common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of APP between February 19, 2002 to September 24, 2003, inclusive and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendant have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, APP common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by APP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

      b.     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of APP; and

      c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

28.     APP describes itself as a specialty pharmaceutical company, with a primary focus on oncology, anti-infective and critical care markets, that develops, manufactures and markets injectable pharmaceutical products. Most of its products are generic versions of brand name products that are still being marketed by proprietary pharmaceutical companies.

29.     At the commencement of the Class Period, Taxol, was marketed by APP's competitor, Bristol-Myers Squibb Co. ("Bristol Myers"), was the world's best-selling chemotherapy drug for cancer. Paclitaxel, the active ingredient in Taxol, requires a toxic solvent called Cremophor to formulate the drug for injection. The toxicity of Cremophor carries side effects and, for this reason, otherwise reduces the dose that can be safely tolerated in most patients. This, in turn, limits the effectiveness of the drug in the treatment of breast cancer. Moreover, patients receiving Taxol require pre-treatment with steroids, which are themselves harmful, to prevent the toxic side effects of Cremophor and, in some cases, require a growth factor, such as G-CSF to overcome the low white blood levels resulting from chemotherapy.

30.     APP claimed to have reformulated Paclitaxel for delivery to the tumor area in a nontoxic solution that did not cause the harmful side effects associated with Taxol. Defendants further claimed that the reformulated Paclitaxel, which it called Abraxane, was therefore safer than Taxol and, because it could be tolerated in higher doses, more effective than Taxol as well. In this regard, the Company stated in its 2002 annual report, filed with the SEC on March 19, 2003, as follows:

Because ABI-007 is not formulated with Cremophor, we believe ABI-007 provides several advantages over Taxol and its generic equivalents, including:

--- avoiding the need for steroid pre-medication

--- reducing or eliminating the need for G-CSF support [to prevent reduction of white blood count]

--- allowing for more rapid infusion without the need for specialized intravenous tubing

31.     Throughout the Class Period, APP stated repeatedly that clinical trials conducted by its parent American Bioscience supported the statements set forth above in paragraph 31, above, with respect to ABI-007's superior effectiveness *vis a vis* Taxol and, largely on the strength of these statements, the Company's share price increased dramatically from $10.09 on February 19, 2002 to a class period high of $44.14 on September 24, 2003. Then, over the course of the next two days, the Company lost approximately one third of its value when it became increasingly clear that the claims defendants had made for Abraxane were materially false and misleading. On September 19, 2003, one day after APP first saw the Phase III data but two trading days before the results were released to the investing public, defendant Soon-Shiong disposed of 300,000 APP shares in a gift to family-owned trusts.

**Materially False and Misleading Statements During The Class Period**

32.     In Phase I clinical trials, researchers test a new drug or treatment in a small group of people for the first time to evaluate its safety, determine a safe dose range, and identify side effects. In Phase II clinical trials, the study drug or treatment is given to a larger group of people to see if it is effective and to further evaluate its safety. In Phase III studies, the study drug or treatment is given to large groups of people to confirm its effectiveness, monitor side effects, compare it to commonly used treatments, and collect information that will allow the drug or treatment to be used safely. These phases are defined by the Food and Drug Administration in

- 11 -

the Code of Federal Regulations.  Throughout the Class Period, defendants made materially false and misleading statements with respect to each phase of the clinical trials.

33.    The Class Period begins on February 19, 2002.  On that date APP issued a news release over *PR Newswire*.   The release was titled "American Pharmaceutical Partners Presents Clinical Development Status Of ABI-007, A Novel Form of Paclitaxel, at Goldman Sachs Oncology Conference."  The release purported to discuss clinical data from Phase I and Phase II clinical studies of ABI-007 in patients with metastatic breast cancer, and the status of APP's Phase III trials.  In the release, the Company stated that, according to the Phase I clinical trial, ABI-007 could be administered at its maximum tolerated dose *without steroid pre-treatment* and that, as part of its Phase II clinical trials, it had administered ABI-007 at a higher dose, relative to Taxol, of 300mg/m2 *without steroid pre-treatment.*   In this regard, the Company stated as follows:

> *"A very methodical approach to determine the safety and efficacy of ABI-007 has been undertaken by completing several mono-therapy studies of this compound in over 250 patients, since initiating Phase I studies in 1998," stated Patrick Soon-Shiong, M.D., Chairman and Chief Executive Officer of American Pharmaceutical Partners (APP).* "Three Phase I studies have been performed in order to determine the maximum tolerated dose (MTD) of ABI-007. It was found that this nanoparticle, Cremaphor-free form of paclitaxel could be tolerated at much higher doses than TAXOL *without the need for steroid pre-treatment therapy*, as is required for Bristol's product. Once the MTD was established, two multi-center Phase II trials administrating ABI-007 at the current FDA-approved dose of TAXOL (175mg/m2) and at a much higher dose of 300mg/m2 over 30 minutes as mono-therapy, *without steroid pre-treatment*, were undertaken to examine the safety and efficacy profile of ABI-007 given to patients with metastatic breast cancer."
>
> Soon-Shiong said that data from these two multi-center Phase II clinical trials have been submitted to the American Society of Clinical Oncology (ASCO) for consideration for presentation at its annual meeting in May 2002.  He also said that a randomized Phase III trial in breast cancer patients to directly compare ABI-

007 with TAXOL has been initiated and a significant number of centers have begun patient enrollment. APP has secured the exclusive North American marketing and manufacturing rights for ABI-007 from American BioScience, Inc., which is responsible for conducting the clinical studies of ABI-007

Many oncology drugs, including paclitaxel, are water insoluble and thus often require toxic solvents to formulate the drugs for injection. TAXOL and its generic equivalents contain the toxic solvent Cremaphor, which limits the dose of TAXOL that can be administered, potentially restricting the efficacy of the drug. Furthermore, patients receiving TAXOL require pre-medication with steroids to prevent the toxic side effects associated with Cremaphor and, in some cases, require a growth factor such as G-CSF to overcome low white blood cell levels resulting from chemotherapy. The FDA-approved dose of TAXOL is 135-175mg/m2, administered over three to 24 hours using specialized intravenous tubing. [Emphasis added.]

34.    On May 20, 2002, the Company issued a news release over the *PR Newswire* in which it purported to present the Phase II Trial Results for ABI-007, and in which it bulleted the following points:

**ABI-007 appears to be well tolerated up to 300 mg/m2 without the need for steroid pre-medication and a reduced need for G-CSF support**

**At 300 mg/m2 ABI-007 showed an 88% first-line response rate in metastatic breast cancer and 61% overall response rate, substantially higher than previously reported**

**ABI-007 showed activity in breast cancer patients who had progressed despite previous TAXOL® therapy**

**A novel mechanism of paclitaxel nanotransport was revealed**

[Emphasis in original]

35.    The release further stated that the Phase II clinical trial established that, because patients receiving ABI-007 were not exposed Cremophor, they did not require pre-treatment with

- 13 -

steroids or G-CSF, even when ABI-007 was administered at the relatively high dose of 300mg/m2. In this regard, the release stated, in pertinent part, as follows:

> "The results from this Phase II study provide clinical evidence that ABI-007 has the potential to be an important advancement in taxane therapy for the treatment of metastatic breast cancer and other solid tumors," said Patrick Soon-Shiong, M.D., chairman and chief executive officer of APP. "It is exciting to find clinical corroboration of our earlier studies in mouse tumor models that ABI-007 appears to be very active in the treatment of solid tumors. *Without the presence of the toxic solvent cremophor, the potential exists for the parent paclitaxel molecule to enter the cell at higher levels where it may exert its anti-tumor effect.* Evidence also suggests ABI-007 may provide a novel mechanism for the nanotransport of paclitaxel resulting in increased intracellular availability of the drug.

> "Data from the Phase II multi-center study showed a statistically significant dose-response effect of ABI-007 at 300 mg/m2 as a front-line therapy for patients with metastatic breast cancer with a response rate of 88% and that *even at this high dose the drug appears to be well tolerated,*" continued Soon-Shiong. *"In addition, because the patients treated with ABI-007 in the Phase II study were not exposed to the toxic cremophor solvent presently used in current branded and generic formulations of paclitaxel, they did not require pre-treatment with steroids or G-CSF, and tolerated higher doses of paclitaxel than those available from the current formulations as they are approved.* This increased dose, in addition to the improved intracellular availability, may have important clinical implications that raise the potential for maximizing the use of paclitaxel in the treatment of solid tumors." [Emphasis added.]

36.    On September 9, 2002, the Company issued another release over the *PR Newswire*, in which it not only focused on the relative safety of ABI-007 compared to that of Taxol but also touted ABI-007's potential as a revenue generator, citing research analysts (who based their conclusions on APP's materially false and misleading statements with respect to ABI-007). In this regard, the release stated:

> Treating breast cancer is never a pleasant proposition. Deadly diseases require strong medicine, and difficult side effects are routine.

One of the leading breast cancer medicines, Taxol, carries side effects such as infection, hair loss, nausea and vomiting, muscle pain and numbness in the extremities.

But improved technology might bring relief to those who suffer from the disease. That's one of the goals of American Pharmaceutical Partners Inc.

The company has rights to a nanoparticle that's key to making a new generic version of cancer fighter paclitaxel, the active ingredient in Taxol. Early studies show that American Pharmaceutical's version makes the drug less toxic.

"Approval would be a major inflection point for (American Pharmaceutical)," said Chief Executive Patrick Soon-Shiong.

That's an understatement. Taxol, made by Bristol Myers Squibb Co., had global sales of more than $1.5 billion last year.

*Analysts say American Pharmaceutical's drug will generate as much as $500 million in annual sales within two to three years of its launch. The firm's 2001 revenue totaled only $192 million.*

What are the differences between the two drugs? For one, Taxol contains cremophor, an emulsifier that increases the drug's toxicity. Patients can take it in only limited doses. Studies show those limits also reduce the amount of paclitaxel that actually reaches a tumor.

American Pharmaceutical's version uses a nanoparticle called ABI-007. It might improve on Taxol in several ways, sources say.

First, it lets the drug be delivered inside albumin, a common human blood protein. That means the paclitaxel doesn't need to be modified with cremophor.

*Doses can be higher with fewer side effects, American Pharmaceutical officials say.*

In addition, phase two studies at the University of Texas found that ABI-007 was more effective than Taxol at shrinking tumors. *It proved effective in one-third of 106 breast cancer patients vs. 25% for Taxol - without the side effects.*

"Any formulation that significantly improves the current toxicity profile has blockbuster potential," said analyst Elliot Wilbur of CIBC World Markets.

American Pharmaceutical licensed the rights to the drug from parent American BioScience for $60 million. That firm and Soon-Shiong control 69% of the company.

Officials expect the drug to get Food and Drug Administration approval by next year's second quarter. It's expected to hit the market in 2004.

For now, ABI-007 is in late-stage phase three trials to treat metastatic breast cancer. More than 350 patients are enrolled. The drug also is in earlier stage tests for a variety of other cancers

37.     On October 25, 2002, the Company issued a release over the *PR Newswire* in which it announced that a purportedly "independent Data Monitoring Committee" had recently met to review the data available to date for the ongoing Phase III clinical trial of ABI-007 and determined that the Phase III trial sample size was sufficient.  In the release, the Company repeated its claim that steroid pretreatment is unnecessary and furthermore, stated that the study had been designed to determine the relative safety and efficacy of ABI-007 and Taxol under these conditions, *i.e.* where patients receiving ABI-007 therapy received no steroid pretreatment and patients receiving Taxol did.  In this regard, the release stated as follows:

> ABI-007 is a next generation nanoparticle paclitaxel in a pivotal randomized controlled Phase III clinical trial comparing the safety and efficacy of 260 mg/m2 of ABI-007 to 175 mg/m2 of Taxol administered every three weeks in patients with metastatic breast cancer. Currently, over 90 centers are involved in the trial in the United States, Canada, United Kingdom and Russia. ABI-007 is infused over 30 minutes *without steroid pretreatment* at a higher dose than Taxol, which requires steroid therapy and infusion over three hours. *The study is designed to compare the safety and efficacy of ABI-007 to Taxol under these conditions*. [Emphasis added.]

38.     On December 2, 2003, the Company issued a release over the *PR Newswire* in which it announced that patient enrollment had been completed in the Phase III clinical trial evaluating ABI-007.  In the release, Company reiterated its statement that the clinical trials had been designed to compare treatment with ABI-007 *without* steroid pre-treatment, on the one

- 16 -

hand, to treatment with Taxol *with* steroid pretreatment on the other. In this regard, the release stated as follows:

> ABI-007 is being evaluated in a pivotal randomized controlled Phase III clinical trial comparing the safety and efficacy of 260 mg/m2 of ABI-007 to 175 mg/m2 of TAXOL® administered every three weeks in patients with metastatic breast cancer. ABI-007 is infused over 30 minutes *without steroid pretreatment* at a higher dose than TAXOL®, which requires steroid therapy and infusion over three hours. The study is designed to compare the safety and efficacy of ABI-007 to TAXOL® *under these conditions.*
>
> Preclinical development of ABI-007 began in 1992, and clinical studies were initiated in 1998. In addition to the aforementioned Phase III clinical trial, a Phase II trial is underway to explore a weekly dosing regimen of ABI-007 in patients with metastatic breast cancer in which taxane therapy has failed. APP has secured the North American marketing and manufacturing rights for ABI-007 from American BioScience, Inc., which is responsible for conducting the clinical studies of ABI-007.

39.    In January 2003, the Company issued a release over the *PR Newswire* in which it announced that the FDA had granted Fast Track designation for ABI-007 for metastatic breast cancer. Fast Track designation is intended to expedite product development by providing for scheduled meetings to seek FDA input into the development plans, the option of submitting a New Drug Application in sections rather than all components simultaneously, and the option of requesting evaluation studies using surrogate endpoints. The FDA uses fast track designation for review of new drugs that are intended to treat serious or life threatening conditions that demonstrate the potential to meet new unmet medical needs. The release stated, in pertinent part, as follows:

> In granting Fast Track designation, the FDA recognized that the current formulation of TAXOL® (Bristol-Myers Squibb) and its generic equivalents, which contain cremophor, is responsible for many of the well-known side effects and administration problems which limit the dose of paclitaxel that currently can be delivered. ABI-007, a cremophor-free nanoparticle paclitaxel, received Fast Track product status from FDA on

the basis that it has the potential to address an unmet medical need in treating metastatic breast cancer.

In early December 2002, APP announced it had completed patient enrollment in the pivotal Phase III clinical trial evaluating ABI-007 in 460 patients with metastatic breast cancer. The randomized controlled Phase III study, designed in close collaboration with FDA and initiated in the summer of 2001, compared the safety and efficacy of 260 mg/m2 of ABI-007 to 175 mg/m2 of TAXOL® administered every three weeks. *ABI-007 was infused over 30 minutes without steroid pretreatment at a higher dose than TAXOL®, which requires steroid therapy and infusion over three hours*. APP has secured that North American marketing and manufacturing rights for ABI-007 from American Bioscience, Inc., which is responsible for conducting the clinical studies of ABI-007.

40.     On June 2, 2003, the Company published a release over the *PR Newswire* in which it announced that ABI-007 was safer and more effective than Taxol based on the results of its Phase II trials.  The release was titled "American Pharmaceutical Partners Announces Anti-Tumor Activity of ABI-007 In Breast Cancer Patients Resistant to Taxane Therapy" and it stated, in pertinent part:

> *Zero incidence of allergic reactions of any grade despite absence of premedication ...*
>
> At the American Society of Clinical Oncology (ASCO) annual meeting held in Chicago, Illinois, American Pharmaceutical Partners, Inc. (NASDAQ: APPX), said investigators today reported on the findings of the first 28 of 100 patients enrolled in a Phase II, metastatic breast cancer trial of ABI-007, a novel Cremophor-free protein engineered nanoparticle paclitaxel. Patients were eligible to enter this trial if they had metastatic breast cancer and had shown ongoing growth of their tumor even after receiving either TAXOL and/or TAXOTERE therapy. In this refractory or resistant population, ABI-007 was administered weekly, at a dose of 100 mg/m2 over 30 minutes, *without steroid pretreatment,* and was *found to be well tolerated* with positive evidence of anti-tumor activity, despite prior progression of tumor growth in these patients after prior taxane therapy. [Emphasis added.]
>
> Following weekly ABI-007 administration, a reduction of tumor size by at least 50% was confirmed in 18% (5/28) of the patients evaluated to date with duration of response ranging from 6 months to over 10 months despite their demonstrated resistance to current

taxane therapy. Furthermore, 21% (6/28) of these patients to date currently remain progression-free for over 8 months, with 2 currently progression-free for over 10 months, and all six patients remain ongoing in the study receiving weekly dosing of ABI-007.

With regard to safety, the investigators noted that at the dose of 100 mg/m2 weekly, ABI-007 was *well tolerated* with no patients showing grade 3 or 4 neuropathy; only 4% of patients showing evidence of grade 4 neutropenia (without growth factor support); and no patients displaying any evidence of allergic reactions at any grade *despite the fact that no steroid premedication was given*. The most common adverse events reported were mild in nature and included those typical of taxane therapy including alopecia, nausea, and fatigue.

"The findings of both prolonged duration of response with ABI-007 in this refractory breast cancer patient population, as well as the extremely low incidence of toxicity of this novel nanoparticle paclitaxel is impressive," stated Joanne Blum, M.D., Director, Hereditary Cancer Risk Program and Research Site Leader, Baylor-Sammons Cancer Center, US Oncology, Dallas, TX, and Principal Investigator of the Phase II trial.

"We have enrolled 100 patients in this trial to date and have extended the trial to explore an increased dose of ABI-007 in light of the low incidence of toxicity at the 100 mg/m2 weekly dose," added Joyce O'Shaughnessy, M.D., Co-Chair, Breast Cancer Research, Baylor-Sammons Cancer Center, US Oncology, Dallas, TX. "This study provides clinical evidence that the nanoparticle paclitaxel ABI-007 is active in the breast cancer population and that it can be administered in relatively high doses while avoiding the toxic effects associated with solvents such as Cremophor or Tween." [Emphasis added.]

41.     The statements referenced above in ¶¶ 34-42 were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, including, but not limited to:

a.      Defendants falsely or recklessly disregarded that the clinical trials did not support their claims for the efficacy and safety of Abraxane;

b.      Abraxane could not be safely tolerated at much higher doses than Taxol;

c.      In the clinical trials, Abraxane was not administered *without* steroid pre-treatment in the clinical trials but rather, was administered *without routine* steroid pretreatment. *i.e.* some patients received pre-treatment with steroids.

d.      even if the FDA approves Abraxane as a new drug, APP will not be in a position to successfully compete with other companies that are developing their own formulations of Taxol;

e.      The clinical trial results were not sufficiently conclusive to all for FDA approval of Abraxane.

## The Truth Begins To Emerge

42.      On September 24, 2003, the Company issued a release over the *PR Newswire* which ostensibly announced positive results of the Phase III trials but analysts were troubled by the lack of detail and the inconsistent statements with respect to the necessity for steroid pre-treatment with Abraxane. Whereas the Company had previously stated that the study was being conducted with *no steroid pre-treatment,* the release now stated that it was conducted with *no routine* pre-medication, indicating both that some subjects received pretreatment, contrary to the Company's previous statements. The release stated that neuropathy, *i.e.* nerve damage, was *more* common in subjects receiving Abraxane than it was in Taxol subjects. Moreover, while the release discussed, generally, the relative safety and effectiveness of Abraxane and Taxol, it provided none of the underlying data. The release stated, in pertinent part:

> American Pharmaceutical Partners, Inc. (NASDAQ: APPX), and American BioScience, Inc. (ABI) announced today that the primary efficacy objective has been exceeded in the randomized, controlled Phase III clinical trial in 460 patients with metastatic breast cancer of ABRAXANETM (ABI-007) versus the

Cremophor® solvent-based TAXOL. Initial analysis of the data indicates that this solvent-free nanoparticle paclitaxel, ABRAXANE, resulted in higher anti-tumor activity and was not more toxic than TAXOL.

Specifically, the findings of the study were:

* A higher tumor response rate in patients receiving ABRAXANE

* A longer time to tumor progression in patients receiving ABRAXANE

* Absence of severe hypersensitivity reactions despite *no routine* pre-medication in patients receiving ABRAXANE

* Both treatments were well tolerated with a high percentage of patients receiving the planned dose on both arms; neuropathy was more common on the ABRAXANE arm while neutropenia was more common on the TAXOL arm. Fluid retention was infrequent in both arms and there were no septic deaths in the study. "We are extremely pleased and excited that the increase in antitumor activity we had seen with ABRAXANETM in preclinical studies was confirmed in this Phase III trial, and further translated into an increased time to tumor progression in patients with metastatic breast cancer," said Michael J. Hawkins, M.D., Chief Medical Officer at ABI. "Our preclinical data indicated that higher intratumor concentrations of paclitaxel were achieved following ABRAXANE, compared to equal doses of TAXOL. This effect, coupled with our ability to increase the dose of paclitaxel administered predicted that ABRAXANE would have more anti-tumor activity than TAXOL.

This is now supported by the randomized Phase III trial in patients with metastatic breast cancer in which the target lesion response rate was higher with ABRAXANE as compared to TAXOL, and the time to tumor progression was longer in patients treated with ABRAXANE. We will now expeditiously complete filing of the NDA which has been granted fast-track designation."

Patrick Soon-Shiong, M.D., Chairman and CEO of APP, stated, "Although the Phase III clinical trial was only unblinded last week and the company is continuing its comprehensive analysis of the data, we believe the significance of the results warrant releasing our initial analysis of the data. We expect full analysis to take several more weeks, at which point we plan to make a detailed presentation of the data at a scientific meeting later this year."

- 21 -

43.     In response to this news, APP's shares fell 33%, from a high of $44.15 on September 24, 2003 to a low of $29.59 on September 25, 2003.   On September 24, 2003 *The Wall Street Journal* published an article on the announcement in which it noted that, "the company, however, didn't release the data underlying the trial results," and further noted that, "the trial also lacked a common safeguard known as double-blinding designed to prevent research bias, since doctors and patients both knew whether Abraxane or Taxol was in use." In a research reported dated October 1, 2003, Kevin McNamara, an analyst for Sterling Financial Investment Group, claimed to have come into possession of what appeared to be a protocol for ABI-007 clinical trials that belied the companies' statements about the product.   McNamara stated:

> To the extent that the document is genuine, we believe it supports our thesis that ABI-007 is not approvable.  More importantly, it raises additional serious questions in our mind about the company's previously released data with regard to ABI-007.

> For example, we raised the confusing issue of apparent premedication in the Abraxane arm in a note dated September 24th after reviewing the Company's press release.  We noted that the mantra of "no premedication" had suddenly changed to "no routine medication."  We view the option of steroid pretreatment in the Phase III trial as medically sound and have no issue with it per se. What we do have an issue with is the repeated characterization of Abraxane as an ultra high octane Taxol without the baggage of premedication, among other things.

44.     On October 6, 2003, *Barron's* published an article analyzing market reaction to APP's September 24, 2003 announcement and attributed the sharp drop in APP share price to the lack of detail in the news release and signaled that Abraxane not only was not as safe or effective as the Company claimed, but that also that it stood less chance of winning FDA approval.  In this regard, the *Barron's* article stated as follows:

> The statement gave remarkably few details on the performance of Abraxane, other than to say it outperformed Taxol, the standard product

used to slow breast cancer. The news--or rather, lack of it--didn't sit well with investors, who cut American Pharmaceutical Partners' shares by one-third, to a recent 30.

As APP's stock-market value sank from $3 billion to $2 billion, CEO Patrick Soon-Shiong insisted he would only reveal details of the study at a scientific meeting.

That reticence dismayed Gregory Frykman, an oncologist with the Washington Research Group unit of Charles Schwab, and a former Food and Drug Administration staffer. "The omission of the study's actual numerical results from yesterday's press release causes us concern, "Frykman told clients. A subsequent chat with Soon-Shiong failed to reassure the Schwab analyst who believes that FDA approval of Abraxane is unlikely.

Abraxane was meant to be an improved form of paclitaxcel (the chemical name for Taxol), and a vindication for Dr. Soon-Shiong, who's been dogged by controversy for more than a decade. (See Tech Trader, May 20, 2002).

In the early 1990s, Soon-Shiong earned notoriety as a physician who tried to cure diabetes through cell transplants. The treatment failed, as did the business venture based on the treatment -- leaving the doctor embroiled in lawsuits with embittered business partners, including his brother.

Soon-Shiong settled those lawsuits for $32 million, which he could well afford after he became a billionaire from the 2001 public offering APP, an injectable drug business that has the marketing rights to Abraxane. Over two-thirds of APP shares are owned by Soon-Shiong's private firm, American Bioscience --- which got a quick $60 million for licensing Abraxane to its subsidiary APP. It's registered to sell 3 million APP shares.

Over two-thirds of APP shares are owned by Soon-Shiong's private firm, American BioScience--which got a quick $60 million for licensing Abraxane to its subsidiary APP. It's registered to sell 3 million APP shares.

The billionaire doctor doesn't just run the business. He's a medical investigator in the clinical tests of Abraxane. Even before last month's announcement, those tests invited suspicion. A protocol for Abraxane's clinical trial reported a successful response in half of 48 patients getting a high dose of the drug in the Phase II trial. Data was reported on an additional 11 Phase II patients at a cancer meeting last year, and the new numbers suggested that 100% of the additional patients had responded to Abraxane.

The company says that it saw the Phase III data September 18th. The next day, Soon-Shiong disposed of 300,000 APP shares, in a gift to family-owned trusts. On September 24th, APP issued its controversial release. The company wouldn't comment to *Barron's*, beyond that release.

Many patients in the non-blinded trial were in far-away places such as Russia. *Barron's* did talk to sources who claimed familiarity with the undisclosed Phase III numbers on Abraxane. They said the response rate of Abraxane was double that of Taxol, while white blood-cell loss was half. The resolution of this clinical controversy must await a rigorous review by the FDA.

## UNDISCLOSED ADVERSE INFORMATION

66.    The market for APP's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, APP's common stock traded at artificially inflated prices during the Class Period. plaintiff and other members of the Class purchased or otherwise acquired APP securities relying upon the integrity of the market price of APP's securities and market information relating to APP, and have been damaged thereby.

67.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of APP's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

68.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about  APP's business, prospects and operations. These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of APP and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

69. As alleged herein, defendants acted with *scienter* in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding APP, their control over, and/or receipt and/or receipt of information of APP's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning APP, knew of or recklessly disregarded the undisclosed facts adversely affecting APP. Moreover, defendant Soon-Shiong disposed of 300,000 of his personally held APP shares just two trading days before the September 24, 2003 news release.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

## FRAUD-ON-THE-MARKET DOCTRINE

70. At all relevant times, the market for APP's securities was an efficient market for the following reasons, among others:

(a)     APP's stock met the requirements for listing, and was listed and actively traded on the NASDAQ national market, a highly efficient and automated market;

(b)     As a regulated issuer, APP filed periodic public reports with the SEC and the NASDAQ;

(c)     APP regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     APP was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

71.     As a result of the foregoing, the market for APP's securities promptly digested current information regarding APP from all publicly available sources and reflected such information in APP's stock price. Under these circumstances, all purchasers of APP's securities during the Class Period suffered similar injury through their purchase of APP's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

72.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendant is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of APP who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against
### All Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of APP's securities; (iii) permit defendant Soon-Shiong to sell dispose of his personally-held APP common stock at artificially inflated prices; and (iv) cause plaintiff and other members of the Class to purchase APP's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant took the actions set forth herein.

75.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for APP's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

76. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

77. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of APP as specified herein.

78. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of APP's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about APP and its business operations and

- 28 -

future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of APP's securities during the Class Period.

79.     Defendants' primary liability, and controlling person liability, arises from the following facts: (i) defendants were high-level executives of the Company during the Class Period and Soon-Shiong was the controlling shareholder of APP's parent company; (ii) defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) defendants were aware of the Company's dissemination of information to the investing public which defendants knew or recklessly disregarded was materially false and misleading.

80.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing APP's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, if defendants did not have actual knowledge of the misrepresentations and omissions alleged, defendants were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

81.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of APP securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of APP publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired APP securities during the Class Period at artificially high prices and were damaged thereby.

82.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of APP, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their APP securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

83.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violations Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     The Individual Defendants acted as a controlling person of APP within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

88.     As set forth above, defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct

and proximate result of APP's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against the defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 23, 2003

William Morris, Individually and on Behalf of All Other Similarly Situated, Plaintiff

By: _____

Marvin A. Miller
Jennifer W. Sprengel
Anthony F. Fata
**MILLER FAUCHER and CAFFERTY LLP**
30 North LaSalle Street
Suite 3200
Chicago, IL 60602
(312) 782-4880

*Designated Local Counsel*

- 32 -

Steven G. Schulman
Peter E. Seidman
**MILBERG WEISS BERSHAD**
 **HYNES & LERACH LLP**
One Pennsylvania Plaza - 48th Floor
New York, NY 10119-0165
(212) 594-5300

Nadeem Faruqi
**FARUQI & FARUQI, LLP**
320 East 39th Street
New York, NY  10016
(212) 983-9330

*Counsel for Plaintiff*

## CERTIFICATION OF WILLIAM MORRIS
## IN SUPPORT OF CLASS ACTION COMPLAINT

William Morris ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to American Pharmaceutical Partners, Inc.:

Purchase of 100 shares at $12 5/8 per share on 03/13/03

5.    In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs

and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

October 21, 2003

William Morris

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE RONALD GUZMAN

# Civil Cover Sheet 03C 7525

MAGISTRATE JUDGE ASHMAN

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

| | |
|---|---|
| **Plaintiff(s):** **WILLIAM MORRIS,** | **Defendant(s):AMERICAN BIOSCIENCE, INC., et al.,** |
| County of Residence: Morris County | County of Residence: |
| Plaintiff's Atty: Miller Faucher and Cafferty LLP<br>30 North LaSalle Street, Suite 3200<br>Chicago, Illinois 60602<br>(312) 782-4880 | Defendant's Atty: |

U.S. DISTRICT COURT CLERK
OCT 24 AM 11: 35
FILED-EDA
03

---

II. Basis of Jurisdiction:     **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal
Parties **(Diversity Cases Only)**
                    Plaintiff:- **N/A**
                    Defendant:- **N/A**

IV. Origin :                    **1. Original Proceeding**

V. Nature of Suit:              **850 Securities / Commodities / Exchange**

VI.Cause of Action:             **15 U.S.C. §§78j(b) and 78t(a)**

DOCKETED
OCT 2 7 2003

VII. Requested in Complaint
         Class Action: **Yes**
         Dollar Demand:
         Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

---

**Signature:** _Marvin A. Miller/sw_

**Date:** _10/23/03_

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**     Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

JUDGE RONALD GUZMAN

In the Matter of

**WILLIAM MORRIS,**

        v.

MAGISTRATE JUDGE ASHMAN

Case Number:

**AMERICAN BIOSCIENCE, INC., et al.**



03C 7525

### APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

William Morris, individually and on behalf of all others similarly situated, Plaintiff

| (E) | | (F) | |
|---|---|---|---|
| SIGNATURE *Nadeem Faruqi (mkm)* | | SIGNATURE | |
| NAME Nadeem Faruqi | | NAME Anthony F. Fata | |
| FIRM Faruqi & Faruqi, LLP | | FIRM Same as (B) | |
| STREET ADDRESS 320 East 39th Street | | STREET ADDRESS | |
| CITY/STATE/ZIP New York, New York 10016 | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER (212) 983-9330 | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS afata@millerfaucher.com | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06269721 | |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | | MEMBER OF TRIAL BAR? YES ☐ NO ☐ | |
| TRIAL ATTORNEY? YES ☑ NO ☐ | | TRIAL ATTORNEY? YES ☐ NO ☐ | |
| | | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | |
| (G) | | (H) | |
| SIGNATURE | | SIGNATURE | |
| NAME | | NAME | |
| FIRM | | FIRM | |
| STREET ADDRESS | | STREET ADDRESS | |
| CITY/STATE/ZIP | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | | MEMBER OF TRIAL BAR? YES ☐ NO ☐ | |
| TRIAL ATTORNEY? YES ☐ NO ☐ | | TRIAL ATTORNEY? YES ☐ NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | |

DOCKETED

OCT 27 2003

FILED-EB4

03 OCT 24 AM 11: 35

U.S. DISTRICT COURT CLERK

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**WILLIAM MORRIS,**

v.

**AMERICAN BIOSCIENCE, INC., et al.,**

JUDGE RONALD GUZMAN

MAGISTRATE JUDGE ASHMAN

**03C 7525**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

William Morris, individually and on behalf of all others similarly situated, Plaintiff

| (A) | (B) |
|-----|-----|
| SIGNATURE *Steven G. Schulman / as/bm* | SIGNATURE *Marvin A. Miller / ...* |
| NAME Steven G. Schulman | NAME Marvin A. Miller |
| FIRM Milberg Weiss Bershad Hynes & Lerach LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS One Pennsylvania Plaza, 48th Floor | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP New York, New York 10119 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (212) 594-5300 / FAX NUMBER | TELEPHONE NUMBER (312) 782-4880 / FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☑ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ |

| (C) | (D) |
|-----|-----|
| SIGNATURE *Peter E. Seidman / as/bm* | SIGNATURE *Jennifer W. Sprengel / as/bm* |
| NAME Peter E. Seidman | NAME Jennifer W. Sprengel |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ |

DOCKETED OCT 27 2003

1-3